# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 14, 2014

Lyle W. Cayce
Clerk

No. 12-60668

DOLGENCORP, INC. and DOLLAR GENERAL CORP.

Plaintiffs - Appellants

v.

THE MISSISSIPPI BAND OF CHOCTAW INDIANS; THE TRIBAL COURT OF THE MISSISSIPPI BAND OF CHOCTAW INDIANS; CHRISTOPHER A. COLLINS, in his official capacity; JOHN DOE, a minor, by and through his parents and next friends JOHN DOE SR. AND JANE DOE

Defendants - Appellees

---

Appeal from the United States District Court
for the Southern District of Mississippi

---

Before SMITH, HAYNES, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

The court previously issued its opinion in this case on October 3, 2013. *Dolgencorp, Inc. v. Miss. Band of Choctaw Indians*, 732 F.3d 409 (5th Cir. 2013). We hereby withdraw the previous opinion and substitute the following.

Dolgencorp, Inc. and Dollar General Corp. (collectively "Dolgencorp") brought an action in the district court seeking to enjoin John Doe, a member of the Mississippi Band of Choctaw Indians, and other defendants (collectively "the tribal defendants") from adjudicating tort claims against Dolgencorp in the Choctaw tribal court. The district court denied Dolgencorp's motion for

No. 12-60668

summary judgment and granted summary judgment in favor of the tribal defendants, concluding that the tribal court may properly exercise jurisdiction over Doe's claims. Because we agree that Dolgencorp's consensual relationship with Doe gives rise to tribal court jurisdiction over Doe's claims under *Montana v. United States*, 450 U.S. 544, 564-66 (1981), we AFFIRM the district court's judgment.

## BACKGROUND

Dolgencorp operates a Dollar General store on the Choctaw reservation in Mississippi. The store sits on land held by the United States in trust for the Mississippi Band of Choctaw Indians, and operates pursuant to a lease agreement with the tribe and a business license issued by the tribe. At all relevant times, Dale Townsend was the store's manager. The tribe operates a job training program known as the Youth Opportunity Program ("YOP"), which attempts to place young tribe members in short-term, unpaid positions with local businesses for educational purposes. In the spring of 2003, Townsend, in his capacity as manager of the store, agreed to participate in the YOP. Pursuant to this program, John Doe, a thirteen-year-old tribe member, was assigned to the Dollar General store. Doe alleges that Townsend sexually molested him while he was working at the Dollar General store.

In January 2005, Doe sued Dolgencorp and Townsend in tribal court. Doe alleges that Dolgencorp is vicariously liable for Townsend's actions, and that Dolgencorp negligently hired, trained, or supervised Townsend. Doe further alleges that the assault has caused him severe mental trauma, and seeks "actual and punitive damages in a sum not less than 2.5 million dollars."

Dolgencorp and Townsend filed motions in the tribal court seeking to dismiss Doe's claims based on lack of subject-matter jurisdiction. The tribal court denied both motions. Both parties petitioned the Choctaw Supreme Court for interlocutory review of the lower court's order denying the motions to

2

dismiss. Under an analysis based on *Montana v. United States*, 450 U.S. 544 (1981), the Choctaw Supreme Court held that subject-matter jurisdiction existed as to both Dolgencorp and Townsend and therefore dismissed the appeal, remanding the case to the lower court.

On March 10, 2008, Dolgencorp and Townsend filed an action in the U.S. District Court for the Southern District of Mississippi against the tribal defendants. Dolgencorp and Townsend allege that the tribal court lacks jurisdiction over them in the suit filed by Doe and seek to enjoin the prosecution of Doe's suit in tribal court. Dolgencorp and Townsend each filed a subsequent motion for a temporary restraining order and a preliminary injunction.

The district granted Townsend's motion but denied Dolgencorp's motion. The district court reasoned that "[i]f John Doe performed services for Dolgen that had value to Dolgen such that Dolgen enjoyed a commercial benefit from its agreement to allow his placement in its store, then it would be reasonable to conclude that there existed the kind of consensual relationship required by *Montana*'s first exception."[1] *Dolgen Corp., Inc. v. Mississippi Band of Choctaw Indians*, No. 4:08CV22, 2008 WL 5381906, at \*5 (S.D. Miss. Dec. 19, 2008). The district court found no evidence as to "whether Dolgen's participation was essentially gratuitous or whether it received a commercial benefit from the arrangement." *Id.* at \*6. Accordingly, the district court held that Dolgencorp had not carried its burden of establishing likely success on the merits (*i.e.* showing that the first *Montana* exception does not apply). *Id.* The district court also rejected Dolgencorp's argument that Doe's lawsuit has no nexus to the alleged consensual relationship between Dolgencorp and the tribe regarding the

---

[1] As explained more fully below, *Montana* and its progeny provide two exceptions to the general rule that Indian tribes cannot exercise civil jurisdiction over non-members. The first *Montana* exception, also known as the consensual relationship exception, provides that a tribe may regulate conduct that has a nexus to some consensual relationship between the non-member and the tribe or its members.

YOP. *Id.* However, the district court held that because Townsend personally had not entered into any consensual relationship with either the tribe or Doe, the tribal court had no jurisdiction over him. *Id.* at *7.

Dolgencorp and the tribal defendants subsequently filed cross motions for summary judgment. In its order granting the tribal defendants' motion and denying Dolgencorp's motion, the district court explained:

> It now appears undisputed that Dale Townsend, purportedly on behalf of Dolgen, agreed with the Tribe to participate in the Tribal Youth Opportunity Program, and that based on such agreement, John Doe was placed in the Dollar General store under Townsend's direct supervision. Doe did not thereby become an employee of Dolgen, but he functioned as an unpaid intern or apprentice, receiving job training from Dolgen and in turn provid[ing] free labor to Dolgen for the period of his assignment. In the court's opinion, as a consequence of this arrangement, Dolgen implicitly consented to the jurisdiction of the Tribe with respect to matters connected to this relationship.

*Dolgencorp Inc. v. Mississippi Band of Choctaw Indians*, 846 F. Supp. 2d 646, 650 (S.D. Miss. 2011) (footnote omitted). The district court further held that Doe's tort claims, "being based on Townsend's alleged molestation of John Doe during his tenure at the store, arise directly from this consensual relationship so that the requirement of a sufficient nexus between the consensual relationship and exertion of tribal authority is satisfied." *Id.*

The district court also rejected Dolgencorp's argument, based on *Plains Commerce Bank v. Long Family Land and Cattle Co., Inc.*, 554 U.S. 316 (2008), that "the consensual relationship exception does not support tribal jurisdiction since the nonmember conduct at issue does not implicate tribal governance or internal relations." *Dolgencorp*, 846 F. Supp. 2d at 650-51. The district court explained:

> The parties disagree as to the meaning and import of *Plains Commerce Bank* with respect to the first *Montana* exception. Plaintiffs submit that under the Court's interpretation of the

exception in *Plains Commerce Bank*, no longer will every consensual relationship between a nonmember and a tribal member occurring on the reservation be sufficient to establish tribal jurisdiction over claims with a nexus to that relationship; rather, only those consensual relationships that are evaluated and determined to have an impact on tribal self governance or internal relations will trigger tribal jurisdiction. Plaintiffs contend that since the consensual relationship here involved does not implicate tribal self-governance or internal relations, then the exception does not apply and there can be no basis for tribal jurisdiction.

Defendants, on the other hand, maintain that nothing in *Plains Commerce Bank* altered the basic *Montana* framework and that to establish applicability of the consensual relationship exception, no showing is required to be made beyond the existence of the consensual relationship which supports a finding of consent to tribal jurisdiction, and the nexus between the consensual relationship and exertion of tribal authority. According to defendants, it is implicit in *Montana* and its progeny that the right of Indian tribes to self governance includes the right to adjudicate civil disputes arising from voluntary consensual relationships between tribes and their members and nonmembers. That is, disputes arising from member-nonmember or tribe-nonmember consensual relationships are deemed as a matter of law to impact tribal rights of self-government sufficient to permit the exercise of tribal court jurisdiction to adjudicate such disputes.

*Id.* at 652-53 (footnote omitted). The district court agreed with the tribal defendants' position, stating that "although a number of post-*Plains Commerce Bank* cases have considered the consensual relationship exception, none has identified the additional showing advocated by plaintiffs as a prerequisite to its application." *Id.* at 653-54 & n.3. Accordingly, the district court concluded that tribal court jurisdiction was permitted under the first *Montana* exception. *Id.* at 654.

Dolgencorp appealed. Dolgencorp does not contend that there are disputed questions of material fact; instead, it argues that the district court erred in its

legal determination that the *Montana* consensual relationship exception was satisfied.

## DISCUSSION

This case deals with the inherent sovereign authority of Indian tribes. Indian tribes can be viewed as independent sovereign communities that have lost some aspects of sovereignty. *See, e.g.*, *United States v. Wheeler*, 435 U.S. 313, 322-23 (1978).

> The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

*Id.* at 323. The Supreme Court has recognized that "both the tribes and the Federal Government are firmly committed to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334-35 (1983). Moreover, "[t]ribal courts play a vital role in tribal self-government, . . . and the Federal Government has consistently encouraged their development." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14-15 (1987).

Generally, Indian tribes retain the power to govern themselves and to control relations between members of the tribe. *See Wheeler*, 435 U.S. at 326. On the other hand, "by virtue of their dependent status," Indian tribes have been largely divested of control over external relations; *i.e.* "relations between an Indian tribe and nonmembers of the tribe." *See id.* In other words, "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Montana*, 450 U.S. at 564.

No. 12-60668

In *Montana*, the Supreme Court recognized that generally, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 450 U.S. at 565. However, the Court explained:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.[2]

*Id.* The Court later held that "*Montana's* consensual relationship exception requires that the tax or regulation imposed by the Indian tribe have a nexus to the consensual relationship itself." *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 656 (2001). Despite the limitations recognized in *Montana* and subsequent cases, the Court has consistently acknowledged that "[t]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty." *Iowa Mut.*, 480 U.S. at 18.

"[W]here tribes possess authority to regulate the activities of nonmembers, civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts." *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997) (quotation and brackets omitted). A tribe's regulation of nonmember conduct through tort law is analyzed under the *Montana* framework. *See, e.g., Attorney's Process & Investigation Services, Inc. v. Sac & Fox Tribe*, 609 F.3d 927, 938 (8th Cir. 2010) ("If the Tribe retains the power under *Montana* to regulate . . . conduct, we fail to see how it makes any difference whether it does so through

---

[2] The Court further held that "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. Because the tribal defendants do not argue that this second exception is applicable here, we do not consider it further.

precisely tailored regulations or through tort claims . . . ."); *Philip Morris USA, Inc. v. King Mountain Tobacco Co., Inc.*, 569 F.3d 932, 939 (9th Cir. 2009) ("The *Montana* framework is applicable to tribal adjudicative jurisdiction, which extends no further than the *Montana* exceptions.").[3]  In considering regulation through tort law, "courts applying *Montana* should not simply consider the abstract elements of the tribal claim at issue, but must focus on the specific nonmember conduct alleged, taking a functional view of the regulatory effect of the claim on the nonmember." *Attorney's Process*, 609 F.3d at 938.

Dolgencorp presents several arguments as to why tribal court jurisdiction over Doe's tort claims is not justified under the *Montana* consensual relationship exception.

## I.    Commercial relationship

Under *Montana*, a tribe may regulate "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, *or other arrangements*."  450 U.S. at 565 (emphasis added).  Relying on a single repudiated appellate opinion, Dolgencorp argues that "'other arrangements' . . . also must be of a commercial nature." *Boxx v. Long Warrior*, 265 F.3d 771, 776 (9th Cir. 2001); *see Smith v. Salish Kootenai College*, 434 F.3d 1127, 1137 n.4 (9th Cir. 2006) (en banc) (disapproving

---

[3] The dissenting opinion suggests that "[b]efore today, no circuit court has upheld Indian-court jurisdiction, under *Montana*'s first exception, over a tort claim against a nonmember defendant."  However, every circuit court to consider the question – including the Fifth Circuit – has either held or assumed that tribal courts may exercise jurisdiction over tort claims against non-members under the first *Montana* exception.  *See, e.g., Bank One, N.A. v. Shumake*, 281 F.3d 507, 509-12 & n.13 (5th Cir. 2002) (finding colorable tribal court jurisdiction over fraud claims by Choctaw tribe members against a non-member bank based on the first *Montana* exception, such that tribal exhaustion was required).  No circuit court has held that such tort claims are not allowed or suggested that they should be treated differently from other types of regulation of non-member conduct.  Furthermore, no circuit court has held that tribal court tort jurisdiction over a non-member is allowed under the first *Montana* exception only where such jurisdiction is shown in that specific case to be necessary to protect tribal self-government or to control internal relations.

of this language in *Boxx*).     In other words, Dolgencorp argues that noncommercial relationships do not give rise to tribal jurisdiction under the first *Montana* exeption.     We decline to impose such a restriction, which does not appear to be supported by any compelling rationale.     Moreover, such a requirement would be easily satisfied in this case.  Although Doe worked for only a brief time at the Dollar General store and was not paid, he was essentially an unpaid intern, performing limited work in exchange for job training and experience.  This is unquestionably a relationship "of a commercial nature."

## II.    Nexus

Dolgencorp argues that there is no nexus between its participation in the YOP and Doe's tort claims.  We disagree.  The conduct for which Doe seeks to hold Dolgencorp liable is its alleged placement, in its Dollar General store located on tribal lands, of a manager who sexually assaulted Doe while he was working there.  This conduct has an obvious nexus to Dolgencorp's participation in the YOP.  In essence, a tribe that has agreed to place a minor tribe member as an unpaid intern in a business located on tribal land on a reservation is attempting to regulate the safety of the child's workplace.  Simply put, the tribe is protecting its own children on its own land.  It is surely within the tribe's regulatory authority to insist that a child working for a local business not be sexually assaulted by the employees of the business.  The fact that the regulation takes the form of a tort duty that may be vindicated by individual tribe members in tribal court makes no difference. *See, e.g.*, *Attorney's Process*, 609 F.3d at 938.  To the extent that foreseeability is relevant to the nexus issue, as Dolgencorp suggests, it is present here.  Having agreed to place a minor tribe member in a position of quasi-employment on Indian land in a reservation, it

No. 12-60668

would hardly be surprising for Dolgencorp to have to answer in tribal court for harm caused to the child in the course of his employment.[4]

Dolgencorp confuses the merits of Doe's case with the question of tribal jurisdiction. It may very well be that Dolgencorp did not do, or fail to do, anything that would cause it to be held liable to Doe. The nexus component of the tribal jurisdiction question, however, centers on the nexus between the *alleged* misconduct and the consensual action of Dolgencorp in participating in the YOP.

## III.   The effect of *Plains Commerce*

Dolgencorp argues that *Plains Commerce* narrowed the *Montana* consensual relationship exception, allowing tribes to regulate consensual relationships with nonmembers only upon a showing that the specific relationships "implicate tribal governance and internal relations." In *Plains Commerce*, 554 U.S. at 334-35, the Supreme Court described the *Montana* consensual relationship exception as follows:

---

[4] The dissenting opinion suggests that the nexus is insufficient here because "Dolgencorp could not have anticipated that its consensual relationship with Doe would subject it to any and all tort claims actionable under tribal law." We are not concerned here with "any and all tort claims actionable under tribal law." Doe has brought two specific claims, both of which are based on the alleged sexual molestation of a child by a store manager. We suspect that Dolgencorp could have easily anticipated that such a thing would be actionable under Choctaw law. Accordingly, under the facts of this case, we need not reach the hypothetical factual scenarios posited by the dissenting opinion.

Furthermore, we do not agree that tribal law and tribal court are entirely unfamiliar to Dolgencorp. For example, in its commercial lease agreement, Dolgencorp agrees to "comply with all codes and requirements of all tribal and federal laws and regulations" pertaining to the leased premises. The agreement also provides that it "shall be construed according to the laws of the Mississippi Band of Choctaw Indians and the state of Mississippi" and that it "is subject to the Choctaw Tribal Tort Claims Act." Finally, the agreement provides that "[e]xclusive venue and jurisdiction shall be in the Tribal Court of the Mississippi Band of Choctaw Indians." Although we do not consider whether the lease agreement in itself would have a sufficient nexus to support tribal court jurisdiction over Doe's tort claims, we highlight this agreement to show that a business operating on Indian land in a reservation is unlikely to be surprised by the possibility of being subjected to tribal law in tribal court.

No. 12-60668

The logic of *Montana* is that certain activities on non-Indian fee land (say, a business enterprise employing tribal members) or certain uses (say, commercial development) may intrude on the internal relations of the tribe or threaten self-rule. To the extent they do, such activities or land uses may be regulated. Put another way, certain forms of nonmember behavior, even on non-Indian fee land, may sufficiently affect the tribe as to justify tribal oversight. While tribes generally have no interest in regulating the conduct of nonmembers, then, they may regulate nonmember behavior that implicates tribal governance and internal relations.

(citation and parenthetical omitted). The Court further stated:

[Indian] laws and regulations may be fairly imposed on nonmembers only if the nonmember has consented, either expressly or by his actions. Even then, the regulation must stem from the tribe's inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations. See *Montana*, 450 U.S., at 564, 101 S.Ct. 1245.

*Id.* at 337.

We do not interpret *Plains Commerce* to require an additional showing that one specific relationship, in itself, "intrude[s] on the internal relations of the tribe or threaten[s] self-rule." It is hard to imagine how a single employment relationship between a tribe member and a business could ever have such an impact. On the other hand, at a higher level of generality, the ability to regulate the working conditions (particularly as pertains to health and safety) of tribe members employed on reservation land is plainly central to the tribe's power of self-government. Nothing in *Plains Commerce* requires a focus on the highly specific rather than the general.

Dolgencorp notes the statement in *Plains Commerce* that "a business enterprise employing tribal members . . . *may* intrude on the internal relations of the tribe or threaten self-rule," and that "[t]o the extent [it does], [its] activities . . . may be regulated." 554 U.S. at 334-35 (emphasis added). This statement expresses nothing more than the uncontroversial proposition that a

tribe cannot impose any conceivable regulation on a business simply because it is operating on a reservation and employing tribe members. However, such a limitation is already built into the first *Montana* exception. Under that exception, the tribe may only regulate activity having a logical nexus to some consensual relationship between a business and the tribe or its members. *See, e.g.*, *Philip Morris*, 569 F.3d at 941 ("The mere fact that a nonmember has some consensual commercial contacts with a tribe does not mean that the tribe has jurisdiction over all suits involving that nonmember, or even over all such suits that arise within the reservation; the suit must also arise out of those consensual contacts.").

Our conclusion is strengthened by the fact that since *Plains Commerce* was decided, no court has, despite finding a consensual relationship with a nexus to a tribal regulation, rejected tribal jurisdiction because the relationship did not "implicate tribal governance and internal relations."[5] We also note that any discussion in *Plains Commerce* of tribal authority to regulate nonmember conduct under *Montana* is dicta; its result is based on a holding that *Montana* does not allow a tribe to regulate the sale of land owned by a non-member. *See, e.g.*, *Plains Commerce*, 554 U.S. at 340 ("*Montana* provides that, in certain circumstances, tribes may exercise authority over the conduct of nonmembers,

---

[5] Two district court opinions have suggested that such an additional showing is necessary but have not relied on its absence to reject tribal jurisdiction. *Salt River Project Agricultural Improvement and Power District v. Lee*, No. 08-CV-8028, 2013 WL 321884 at *13-15 (D. Az. Jan. 28, 2013) (finding the first *Montana* exception applicable and stating that "regulating employment implicates the tribe's sovereign authority to control internal relations"); *Rolling Frito-Lay Sales LP v. Stover*, No. 11-CV-1361, 2012 WL 252938 at *4 (D. Az. Jan. 26, 2012) (rejecting tribal court jurisdiction based on a lacking nexus between the consensual relationship and the tort claim).

even if that conduct takes place on non-Indian fee land.  But conduct taking place on the land and the sale of the land are two very different things.").[6]

## IV.    Off-reservation conduct

Dolgencorp argues that Doe failed to adequately allege and prove that Dolgencorp's negligent hiring, training, or supervision of Townsend occurred on the reservation.[7]  However, Dolgencorp failed to present this argument either to

---

[6] The dissenting opinion, relying on law review articles and dicta from *Plains Commerce*, would adopt a "profoundly narrow" interpretation of the *Montana* consensual relationship exception.  As the dissent all but admits, this would read the first *Montana* exception out of existence.  If regulation of some consensual relationship is necessary to protect tribal self-government or to control internal relations, it would seem to fall necessarily within the second *Montana* exception, which allows tribes to regulate non-member conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."  *Montana*, 450 U.S. at 566.

This highly restrictive interpretation appears to be largely driven by the concern that subjecting non-members to the jurisdiction of tribal courts will violate their due process rights, a concern we find to be exaggerated.  It is true that "the Bill of Rights and the Fourteenth Amendment do not of their own force apply to Indian tribes." *Nevada v. Hicks*, 533 U.S. 353, 383 (2001) (Souter, J., concurring).  However, the Indian Civil Rights Act of 1968 imposes numerous constraints on Indian tribes, including a provision that no tribe may "deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law."  25 U.S.C. § 1302(a)(8).  Although the interpretation of this statute may not precisely track the Supreme Court's interpretation of the analogous constitutional language, *see id.* at 384, we have no reason to believe that this results in injustice to litigants.  While hypothesizing about potential unfairness in a tribal court, neither Dolgencorp nor the dissenting opinion points to any actual unfairness in the procedures of this particular tribal court.

[7] Although the Supreme Court has never explicitly held that Indian tribes lack inherent authority to regulate nonmember conduct that takes place outside their reservations, this is at least strongly implied.  For example, *Plains Commerce* states that "*Montana* and its progeny permit tribal regulation of nonmember conduct *inside the reservation* that implicates the tribe's sovereign interests." 554 U.S. at 332 (emphasis added and removed); *see also Philip Morris*, 569 F.3d at 938 ("The jurisdiction of tribal courts does not extend beyond tribal boundaries."); *Hornell Brewing Co. v. Rosebud Sioux Tribal Court*, 133 F.3d 1087, 1091-92 (8th Cir. 1998) ("Neither *Montana* nor its progeny purports to allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring *outside their reservations*."); *but see DISH Network Service L.L.C. v. Laducer*, 725 F.3d 877, 884 (8th Cir. 2013) ("Even if the alleged abuse of process tort occurred off tribal lands, jurisdiction would not clearly be lacking in the tribal court because the tort claim arises out of and is intimately related to DISH's contract with Brian and that contract relates to activities on tribal land.").

the district court or to the tribal courts. "Under this Circuit's general rule, arguments not raised before the district court are waived and will not be considered on appeal unless the party can demonstrate 'extraordinary circumstances.'" *Ag Acceptance Corp. v. Veigel*, 564 F.3d 695, 700 (5th Cir. 2009). Because Dolgencorp has not demonstrated extraordinary circumstances, we decline to consider this argument for the first time on appeal.

Dolgencorp notes that a tribal court's jurisdiction over a nonmember is an issue of subject-matter jurisdiction. *See Nevada v. Hicks*, 533 U.S. 346, 367 n.8. Dolgencorp further notes that because the "concept of subject-matter jurisdiction . . . can never be forfeited or waived . . . [,] defects in subject-matter jurisdiction require correction regardless of whether the error was raised in district court." *United States v. Cotton*, 535 U.S. 625, 630 (2002). Dolgencorp therefore contends that arguments pertaining to the tribal court's lack of jurisdiction can never be waived.

Although it is true that defects in *federal* subject-matter jurisdiction cannot be waived in a federal case, a federal court has no independent obligation to "correct" a tribal court's lack of subject-matter jurisdiction over another case. Dolgencorp, as a plaintiff, must set forth a meritorious case to enjoin the tribal court proceedings based on lack of subject-matter jurisdiction. If it fails to present its arguments at the appropriate time, they are generally waived.

## V. Punitive damages

Dolgencorp argues that the tribal court lacks jurisdiction over Doe's claims because Doe seeks punitive damages. Because the inherent sovereign authority of Indian tribes does not include criminal jurisdiction over non-Indians, Indian tribes "do not have inherent jurisdiction to try and to punish non-Indians." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 195, 212 (1978). Dolgencorp argues, based on *Oliphant*, that Indian tribes likewise have no jurisdiction to impose civil punitive damages on a nonmember. Dolgencorp notes that "the Bill

of Rights and the Fourteenth Amendment do not of their own force apply to Indian tribes." *Hicks*, 533 U.S. at 383 (Souter, J., concurring). Dolgencorp also notes that an award of punitive damages may implicate constitutional protections against excessive punishment, in that "grossly excessive" punitive damages awards violate the Due Process Clause of the Fourteenth Amendment. *BMW of North America v. Gore*, 517 U.S. 559, 568 (1996). Dolgencorp therefore argues: "Because these protections are not present in tribal court, federal recognition of tribal jurisdiction over non-Indians in claims for punitive damages would in and of itself violate the Due Process clause. The federal government simply cannot waive a citizen's constitutional right by making them subject to the jurisdiction of a court where constitutional rights do not apply."

Dolgencorp identifies no authority applying *Oliphant* in the context of civil punitive damages or otherwise holding that Indian tribes are categorically prohibited from imposing punitive damages on nonmembers. Although punitive damages share many characteristics of criminal punishment, they are distinct; for example, punitive damages in civil cases do not invoke double jeopardy concerns. *See, e.g., Hudson v. United States*, 522 U.S. 93, 103 (1997) (a penalty that is "civil in nature" does not implicate double jeopardy). Furthermore, Dolgencorp's broader argument simply proves too much. If the federal government could never "waive a citizen's constitutional right" by subjecting him to the jurisdiction of a court lacking full constitutional protections, a non-Indian could *never* be subjected to tribal court jurisdiction. Yet the Supreme Court has acknowledged that by entering certain consensual relationships with Indian tribes, a nonmember may implicitly consent to jurisdiction in a tribal court that operates differently from federal and state courts. Accordingly, we conclude that the availability of punitive damages has no effect on the tribal court's jurisdiction over Doe's claims against Dolgencorp.

AFFIRMED.

No. 12-60668

JERRY E. SMITH, Circuit Judge, dissenting:

For the first time ever, a federal court of appeals upholds Indian tribal-court tort jurisdiction over a non-Indian, based on a consensual relationship, without a finding that jurisdiction is "necessary to protect tribal self-government or to control internal relations." *Montana v. United States*, 450 U.S. 544, 564 (1981). The majority's alarming and unprecedented holding far outpaces the Supreme Court, which has never upheld Indian jurisdiction over a nonmember defendant.

This ruling profoundly upsets the careful balance that the Supreme Court has struck between Indian tribal governance, on the one hand, and American sovereignty and the constitutional rights of U.S. citizens, on the other hand. The majority's bold announcement is conspicuous for its audacity, given that this court hears few Indian cases and decides little Indian law. I respectfully dissent.

I.

The majority pays only lip service to, but does not heed, the Supreme Court's guidance that "exercise of tribal power beyond what is necessary to pro-tect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express con-gressional delegation." *Id.* One manifestation of that maxim is that Indian tribes lack "inherent sovereign authority to exercise criminal jurisdiction over non-Indians." *Id.* at 565 (citing *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978)). Absent express congressional delegation, therefore, store manager Townsend could not have been criminally prosecuted in tribal court for the alleged molestation of John Doe.[1]

---

[1] *Cf. Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997) ("As to nonmembers . . . a
(continued...)

16

No. 12-60668

The principle on which *Oliphant* relies, moreover, "support[s] the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* Although the Supreme Court has not yet explicitly adopted an *Oliphant*-like rule for civil cases, it has "never held that a tribal court had jurisdiction over a nonmember defendant." *Nevada v. Hicks*, 533 U.S. 353, 358 n.2 (2001). It remains an open question whether there are *any* circumstances under which the Court would find that a tribal court retains civil jurisdiction over a non-Indian defendant such as Dolgencorp.[2]

The civil action here—an ordinary tort action, despite the seriousness of the alleged offense—comes nowhere close to implicating Indian self-government or internal tribal relations.[3] It is therefore easy to conclude that any putative exception to the well-established restriction on jurisdiction over non-Indian defendants could never extent to the instant facts. Even assuming *arguendo* that the Supreme Court would recognize an exception, the logic and structure of *Montana* dictate that its exceptions apply only where adjudicatory or regulatory authority "is needed to preserve the right of reservation Indians to make their own laws and be ruled by them."[4] The Court recently reiterated the limited

---

[1] (...continued)
tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction.").

[2] *See Hicks*, 533 U.S. at 358 n.2; *see also* Jesse Sixkiller, *Procedural Fairness: Ensuring Tribal Civil Jurisdiction After* Plains Commerce Bank*, 26 ARIZ. J. INT'L & COMP. L. 779, 797 (2009) ("[T]he Court seems to be inching toward an *Oliphant*-like rule based on fairness to nonmembers . . . .").

[3] The majority's unsupported statement that "the ability to regulate the working conditions (particularly as pertains to health and safety) of tribe members employed on reservation land is plainly central to the tribe's power of self-government" is—in addition to being alarming for its breadth—nothing more than the majority's *ipse dixit*.

[4] *Strate*, 520 U.S. at 459 (internal quotation marks omitted). Although *TTEA v. Ysleta del Sur Pueblo*, 181 F.3d 676, 684 (5th Cir. 1999), relied on *Iowa Mutual Insurance Co. v. LaPlante*, 480 U.S. 9, 18 (1987), for the proposition that "civil jurisdiction over nonIndians on reservation lands 'presumptively lies in the tribal courts unless affirmatively limited by a spe-
(continued...)

17

No. 12-60668

nature of tribal-court jurisdiction over nonmember defendants by making explicit that *Montana*'s first exception, like its second, "grants Indian tribes nothing beyond what is necessary to protect tribal self-government or to control internal relations."[5]

The majority concedes that "[i]t is hard to imagine how a single employment relationship between a tribe member and a business could ever have such an impact." I agree: *Montana* and its progeny contemplate a profoundly narrow scope for tribal-court jurisdiction over nonmembers, not least because "the Bill

---

[4] (...continued)
cific treaty provision or federal statute,'" that presumption was abrogated by subsequent Supreme Court authority. *See Hicks*, 533 U.S. at 381 (Souter, J., concurring) ("[I]n explaining and distinguishing *Iowa Mutual*, we confirmed in *Strate* what we had indicated in *Montana*: that as a general matter, a tribe's civil jurisdiction does not extend to the 'activities of non-Indians on reservation lands,' *Iowa Mutual*, [480 U.S.] at 18 . . . and that the only such activities that trigger civil jurisdiction are those that fit within one of *Montana*'s two exceptions.").

[5] *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 658–59 (2001) (citations and internal quotation marks omitted); *see Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 332 (2008) ("*Montana* expressly limits its first exception to the 'activities of nonmembers,' 450 U.S., at 565 . . ., allowing these to be regulated to the extent necessary 'to protect tribal self-government [and] to control internal relations,' *id.*, at 564.").

The majority dismisses the relevant language in *Plains Commerce Bank* as *dictum*, but the scholarly consensus agrees that *Plains Commerce Bank* built on a principle articulated in *Montana* and reinforced by its progeny. *See, e.g.*, Sarah Krakoff, *Tribal Civil Judicial Jurisdiction over Nonmembers: A Practical Guide for Judges*, 81 U. COLO. L. REV. 1187, 1190 (2010) ("*Hicks* and *Plains Commerce*, like *Strate*, refrained from adopting a categorical prohibition against tribal civil jurisdiction over nonmembers, but further narrowed the circumstances in which the Court will approve such exercises of tribal authority."). Moreover, the claim that court statements that run contrary to one's legal assertions can be ignored or avoided as "*dictum*" or "*dicta*" is often the last refuge when favorable authority is scant. "Even assuming it is dictum, however, we give serious consideration to this recent and detailed discussion of the law by a majority of the Supreme Court." *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013). The Supreme Court's "recent dictum . . . provides the best, though not infallible, guide to what the law is." *Reich v. Cont'l Cas. Co.*, 33 F. 3d 754, 757 (7th Cir. 1994). As compared to other *dicta*, "[d]icta of the Supreme Court are, of course, another matter." *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980). In *Gearlds*, a recent panel of this court viewed itself legally bound by Supreme Court *dicta* to the extent that, despite our rule of orderliness, it declared prior Fifth Circuit precedent to have been implicitly overruled by that *dicta*.

18

of Rights and the Fourteenth Amendment do not of their own force apply to Indian tribes."[6]  I also agree with the district court that "in no sense can it reasonably be said that the Tribal Court's assuming jurisdiction over the Does' claim against Dolgen[corp] . . . is necessary to protect tribal self-government or control internal relations."[7]

"The *Montana* rule, therefore, and not its exceptions, applies to this case." *Strate*, 520 U.S. at 459.  Doe was free to pursue his claims in the state court open to all Mississippi tort claimants.  *See id.*  Because Dolgencorp's conduct indisputably falls outside the Choctaw Indians' authority to "protect tribal self-government or to control internal relations," *Montana*, 450 U.S. at 544, the jurisdictional inquiry should be easily and rightfully at an end.

This court therefore should reverse the district court and render judgment for Dolgencorp without reaching the first *Montana* exception.  I will address it, nonetheless, because I also disagree with the majority that there was a legally sufficient nexus between Dolgencorp's participation in a short-term, unpaid internship program and the full body of Indian tort law.

---

[6] *Hicks*, 533 U.S. at 383 (Souter, J., concurring).  As aptly stated by the Chief Justice of the Supreme Court of the Citizen Potawatomi Nation of Oklahoma, Director of the U.C.L.A. American Indian Studies Center, and Co-Director of the Native Nations Law and Policy Center, "Though seemingly capacious, these two exceptions to the so-called *Montana* rule have been construed exceedingly narrowly by subsequent Supreme Court decisions."  Angela R. Riley, *Indians and Guns*, 100 GEO. L.J. 1675, 1720 (2012), *excerpted in* IX SCHOLARLY PERSPECTIVES 101 (U.C.L.A. School of Law Fall 2013).

[7] *Dolgen Corp. v. The Mississippi Band of Choctaw Indians*, No. 4:08-CV-22, 2008 WL 5381906, at *3 (S.D. Miss. Dec. 19, 2008); *cf. Strate*, 520 U.S. at 457–58 ("Undoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members.  But if *Montana*'s second exception requires no more, the exception would severely shrink the rule.").

No. 12-60668

II.

Before today, no circuit court has upheld Indian-court jurisdiction, under *Montana*'s first exception, over a tort claim against a nonmember defendant.[8] That exception provides that "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565.

Assuming "the tribal tort at issue here is a form of regulation," *Plains Commerce Bank*, 554 U.S. at 332, "*Montana*'s consensual relationship exception requires that [it] have a nexus to the consensual relationship itself," *Atkinson*, 532 U.S. at 656. The relevant consensual relationship is Dolgencorp's voluntary participation in the Youth Opportunity Program. The majority errantly con-

---

[8] One recent survey reports only four cases upholding tribal-court jurisdiction over a non-member defendant, and just two involving tort law. *See* Krakoff, *supra* note 5, at 1236. In *McDonald v. Means*, 309 F.3d 530 (9th Cir. 2002), the court upheld tribal jurisdiction over a tort suit that occurred on a Bureau of Indian Affairs road over which the tribe retained gatekeeping authority. The Ninth Circuit, however, does not acknowledge that *Montana*'s general rule applies to non-Indian conduct on reservation trust land. *See, e.g.*, *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 813–14, 819 (9th Cir. 2011) (rejecting application of *Montana* but upholding jurisdiction over trespass claim under second exception). Both the Choctaw Supreme Court and the district court *a quo* have ruled, in light of *dicta* in *Hicks* and *Plains Commerce Bank*, that the Ninth Circuit's narrow application of *Montana* is incorrect, a ruling that the tribal defendants do not challenge.

The only decision from a federal circuit that found tribal-court jurisdiction over a tort claim against a non-member defendant is *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927 (8th Cir. 2010), which involved *Montana*'s second exception. The court found that defendants' outrageous alleged conduct—"API's armed agents entered onto tribal trust land without permission of the elected governing body, stormed buildings vital to the Tribe's economy and its self government, committed violent torts against tribal members, forcibly seized sensitive information related to the Tribe's finances and gaming operations, and damaged tribal property"—"menace[d] the 'political integrity, the economic security, [and] the health [and] welfare' of the Tribe to such a degree that it 'imperil[ed] the subsistence' of the tribal community.'" *Id.* at 939 (quoting *Plains Commerce Bank*, 554 U.S. at 341 (alterations in original)). In *DISH Network Service L.L.C. v. Laducer*, 725 F.3d 877, 884 (8th Cir. 2013), the court invoked *Montana*'s first exception in denying a preliminary injunction against Indian court jurisdiction over an unexhausted tort claim, but the court postponed "a definitive resolution of the question."

20

No. 12-60668

tends that, "[h]aving agreed to place a minor tribe member in a position of quasi-employment on Indian land in a reservation, it would hardly be surprising for Dolgencorp to have to answer in tribal court for harm caused to the child in the course of his employment."

That reasoning is foreclosed by *Plains Commerce Bank*, 554 U.S. at 338. There is no reason Dolgencorp should could reasonably have anticipated that, *solely on the basis of its participation in a short-term, unpaid internship program*, it would be subject to the entire—and largely undefined—body of Indian tribal tort law. As the Supreme Court has "emphasized repeatedly in this context, when it comes to tribal regulatory authority, it is not in for a penny, in for a Pound." *Id.* (citation and internal quotation marks omitted).

The elements of Doe's claims under Indian tribal law are unknown to Dolgencorp and may very well be undiscoverable by it.[9] Choctaw law expressly incorporates, as superior to Mississippi state law, the "customs . . . and usages of the tribes." CHOCTAW TRIBAL CODE § 1-1-4. "Where doubt arises as to the customs and usages of the Tribe, the court may request the advice of persons generally recognized in the community as being familiar with such customs and usages." *Id.* Although the claims that Doe wishes to press against Dolgencorp have familiar state-law analogues, the majority's aggressive holding extends to the entire body of tribal tort law—including any novel claims recognized by the Choctaws but not by Mississippi. *Cf. Plains Commerce Bank*, 554 U.S. at 338.

---

[9] Even for the tribes and their members, the status of the law may be unknowable in light of *Montana* and the tribal reliance on custom and practice, "leaving tribes to wonder as to the scope of tribal civil jurisdiction over nonmembers operating on non-Indian lands within Indian Country." Riley, *supra* note 6, at 1720. *Accord* Philip P. Frickey, *(Native) American Exceptionalism in Federal Public Law*, 119 HARV. L. REV. 431, 435 (2005) ("Even the Chief Justice of the North Dakota Supreme Court recently said that, 'in matters involving jurisdiction on Indian reservations, we often are unable to know what the law is until the United States Supreme Court tells us what it is.'").

No. 12-60668

Because Dolgencorp could not have anticipated that its consensual relationship with Doe would subject it to any and all tort claims actionable under tribal law, there is an insufficient nexus to satisfy *Montana*'s first exception. For the majority to hold otherwise raises serious due-process concerns insofar as Dolgencorp will be forced to defend Doe's claims in an unfamiliar forum without the benefit of constitutional protections.[10]

Even accepting as accurate that, in the majority's words, "[i]t is surely within the tribe's regulatory authority to insist that [Doe] not be sexually assaulted by the employees of [Dolgencorp]," it cannot be true that, as the majority insists, "[t]he fact that the regulation takes the form of a tort duty that may be vindicated by individual tribe members in tribal court makes no difference." Although "a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction," *Strate*, 520 U.S. at 453, it does not necessarily follow that the two are coextensive. There are good reasons to construe the former more narrowly: *Montana*'s first exception envisages discrete regulations consented to *ex ante*; the majority, to the contrary, upholds an unprecedented after-the-fact imposition of

_____

[10] Justice Souter explained this serious due-process concern as follows:

> The ability of nonmembers to know where tribal jurisdiction begins and ends, it should be stressed, is a matter of real, practical consequence given "[t]he special nature of [Indian] tribunals," which differ from traditional American courts in a number of significant respects. To start with the most obvious one, it has been understood for more than a century that the Bill of Rights and the Fourteenth Amendment do not of their own force apply to Indian tribes. Although the Indian Civil Rights Act of 1968 (ICRA) makes a handful of analogous safeguards enforceable in tribal courts, "the guarantees are not identical," and there is a "definite trend by tribal courts" toward the view that they "ha[ve] leeway in interpreting" the ICRA's due process and equal protection clauses and "need not follow the U.S. Supreme Court precedents 'jot-for-jot.'" In any event, a presumption against tribal-court civil jurisdiction squares with one of the principal policy considerations underlying *Oliphant*, namely, an overriding concern that citizens who are not tribal members be "protected . . . from unwarranted intrusions on their personal liberty."

*Hicks*, 533 U.S. at 383–84 (Souter, J., concurring) (citations omitted).

22

an entire body of tort law based on Dolgencorp's participation in a brief, unpaid internship program.

And finally, the majority's pronouncement is vague and unworkable in practice. On the one hand, the majority opines that "[h]aving agreed to place a minor tribe member in a position of quasi-employment on Indian land in a reservation, it would hardly be surprising for Dolgencorp to have to answer in tribal court for harm caused to the child in the course of his employment." That broad statement would authorize a tort action in Indian court if, for example, the minor had slipped on a poorly-maintained floor at the store and had cut his finger. In the majority's words, that would violate "the safety of the child's workplace."

On the other hand, the majority emphasizes that "[i]t is surely within the tribe's regulatory authority to insist that a child working for a local business not be sexually assaulted by the employees of the business." Is the majority recognizing tribal-court authority over any tort related to the voluntary job-training program, or only over especially despicable incidents such as sexual assaults? What if the boy had fatally hit his head on the floor? Or would it have to be an intentional tort—a slap on the face, perhaps, for bad performance? Is the majority's unprecedented expansion of Indian-court jurisdiction limited to only highly reprehensible acts, or only to "really bad" acts, or to "sort of bad acts," or to any minor, negligent act, or only to situations in which, in the majority's words, "the tribe is protecting its own children on its own land?

The limits to the majority's dramatic holding remain a secret. In short, the majority gives no real indication of what it means by foreseeability, which means that the next actor in the place of Dolgencorp will have no idea whether it can be subjected to the uncertainties of the Indian courts.[11]

---

[11] The majority's facile statement that "under the facts of this case, we need not reach
(continued...)

No. 12-60668

III.

Although Dolgencorp failed to assert timely that the tribal court lacks jurisdiction to adjudicate Doe's claim of negligent hiring, training, and supervision —because Doe failed adequately to allege and prove that the conduct underlying that claim occurred on the reservation—I would not stop there, as the majority does. This case presents the sort of "extraordinary circumstances" that justify considering a claim presented for the first time on appeal. *See N. Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 916 (5th Cir. 1996).

"Extraordinary circumstances exist when the issue involved is a pure question of law and a miscarriage of justice would result from our failure to consider it." *Id.* The issue raised by Dolgencorp is a pure question of law that requires no factual development in the district court. Whether its argument is waived turns on whether it has met its burden to show that a miscarriage of justice would result from the panel's failure to consider it. *See AG Acceptance Corp. v. Veigel*, 564 F.3d 695, 700 (5th Cir. 2009).

To identify a miscarriage of justice, "we have often considered whether the alleged error is obvious or merely debatable." *Id.* at 701. In this case, the alleged error is obvious. As the majority notes, "*Montana* and its progeny permit tribal regulation of nonmember conduct *inside the reservation* that implicates the tribe's sovereign interests." *Plains Commerce Bank*, 554 U.S. at 332 (emphasis added). *Montana* contains an exception for "civil jurisdiction over non-Indians *on their reservations*." *Id.* at 329 (emphasis added). The Court has given no hint that tribal jurisdiction extends to activity taking place outside of Indian

---

[11] (...continued)
the hypothetical factual scenarios posited by the dissenting opinion" is a duck, not an answer. The majority suggests no test by which future parties in Dolgencorp's circumstance can possibly know when they might be hauled into Indian court pursuant to a consensual relationship" such as the apprentice program.

No. 12-60668

country, as did the hiring, training, and supervision here.[12]

Failure to consider the argument regarding off-reservation conduct causes significant harm to Dolgencorp and does violence to the law. *Cf. AG Acceptance*, 564 F.3d at 701. Dolgencorp will be required, without usual procedural and constitutional protections and in an unfamiliar forum, to defend its off-reservation training, hiring, and supervision procedures. The majority opinion also has profound implications for the due-process rights of other non-Indians who do business on Indian lands in Mississippi, Louisiana, and Texas. The majority's conclusion is flawed, because the Indian court lacks jurisdiction over Doe's claim of negligent hiring, training, and supervision.

As already explained, the Indian court also lacks jurisdiction over the on-reservation conduct for which Doe seeks to hold Dolgencorp vicariously liable, because the conduct does not threaten Indian self-government, nor is there a foreseeable nexus between the whole body of tribal tort law and Dolgencorp's voluntary participation in a brief internship program. The majority's stunning pronouncement expands Indian-court jurisdiction over nonmember defendants far beyond the scope permitted by the Supreme Court or any other appellate authority. It is grave error from which I respectfully dissent.

---

[12] *See also Philip Morris USA, Inc. v. King Mountain Tobacco Co.*, 569 F.3d 932, 938 (9th Cir. 2009) ("[T]ribal jurisdiction is, of course, cabined by geography: The jurisdiction of tribal courts does not extend beyond tribal boundaries."); *Hornell Brewing Co. v. Rosebud Sioux Tribal Court*, 133 F.3d 1087, 1091 (8th Cir. 1998) ("[N]either *Montana* nor its progeny purports to allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring *outside their reservations*."). *But see DISH Network*, 725 F.3d at 883–85.