CHRISTEN, Circuit Judge,
dissenting:
The opinion issued today creates a circuit split and is notable for what it leaves out. First, the majority does not explain that, before they filed claims in tribal court, five out of the seven employee claimants had already received adverse state-court rulings on their claims against the school districts. The majority also overlooks that two of the employee claimants had employment contracts specifying that jurisdiction for any employment disputes would exclusively lie in state or federal court. The majority nominally recognizes the pathmarking case on tribal jurisdiction over nonmembers, Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), only to flip its seminal holding. Montana, and the Supreme Court authority that followed it, make clear that the inherent sovereign powers of Indian tribes generally do not extend to the activities of nonmembers. See Nevada v. Hicks, 533 U.S. 353, 358-59, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001).
The majority takes refuge primarily in two entirely distinguishable cases from our circuit, Water Wheel Camp Recreational Area, Inc. v. LaRance, 642 F.3d 802 (9th Cir. 2011) (per curiam), and Grand Canyon Skywalk Development, LLC v. ‘Sa’ Nyu Wa Inc., 715 F.3d 1196 (9th Cir. 2013), which purport to limit Montana’s framework to cases where there are competing state interests. Water Wheel and Grand Canyon are already recognized as outliers, but the majority goes much farther, striking out on its own and holding that unless a state is seeking to enforce its criminal laws, Montana does not apply to nonmember conduct on tribal land even in the presence of clear competing state interests.
Finally, in my view, the majority gives short shrift to the school districts’ obligation to operate public schools within the Navajo Reservation’s boundaries, treating Window Rock and Pinon Unified School Districts as private parties engaged in consensual, private-sector contractual relationships on the Navajo Reservation.' In fact, the districts are non-tribal-member political subdivisions of the State of Arizona with statutory and state constitutionally imposed mandates to provide a uniform public school system to all Arizona’s children. For these reasons, tribal jurisdiction over these consolidated disputes is neither colorable ,nor plausible, and I must respectfully dissent.
BACKGROUND
This appeal addresses seven cases consolidated by the Navajo tribal court, the Navajo Nation Labor Commission.[1] The claimants are not similarly situated. The first four, Loretta Brutz, Mae John,'and Ann and Kevin Reeves, are employees of Window Rock Unified School District. Respectively, they work as a speech therapist and pathologist, a speech language pathologist, a school psychologist, and a physical therapist. None of them are certified teachers. Brutz and John are members of the Navajo Nation; Ann and Kevin Reeves are not. These four claimants (the Brutz claimants) filed a complaint in state superi- or court challenging Window Rock’s determination that they are not entitled to the *908 merit pay that Arizona’s public school teachers receive pursuant to Arizona’s Proposition 301. See Ariz. Rev. Stat. § 15-977(A), (B). The state superior court agreed with the school district that non-teachers are not entitled to Proposition 301 merit pay, and the Arizona Court of Appeals affirmed that decision. See Reeves v. Barlow, 227 Ariz. 38, 251 P.3d 417 (Ct. App. 2011). Rather than seek review in the Arizona Supreme Court, the Brutz claimants pressed their argument for teacher merit pay by filing new complaints, this time in tribal court.
The next two claimants, Michael Coonsis and Clarissa Hale, are members of the Navajo Nation and former employees of Window Rock. Coonsis and Hale allege that Window Rock violated the Navajo Preference in Employment Act (NPEA).[2] They contend that Window Rock failed to promote them to positions for which they were the most qualified Navajos. After filing employment charges with the Office of Navajo Labor Relations (ONLR), Coon-sis and Hale filed complaints with the tribal court.
The final claimant, Barbara Beall, is a member of the Navajo Nation and a former employee of Pinon Unified School District. Pinon terminated Beall for unprofessional conduct and continual and repeated failure to comply with school-district policies. Beall appealed her termination to a state administrative hearing officer, and lost. Instead of filing an appeal in superior court, Beall filed an employment charge with the ONLR and a complaint in tribal court. Both allege that Pinon violated the NPEA by firing Beall without just cause.
All seven claimants signed employment contracts with the school districts agreeing to abide by applicable laws of the United States and the State of Arizona, as well as the State Board of Education’s policies, rules, and regulations. Hale’s and Beall’s contracts further specified that “Arizona State and federal courts shall exercise exclusive jurisdiction over any and all matters arising out of this contract.”[3]
In tribal court, Window Rock and Pinon filed motions to dismiss these claims for lack of tribal-court jurisdiction, giving the tribal court first crack at resolving this jurisdictional dispute. Without ruling on the motion to dismiss, the tribal court consolidated the employees’ claims, and ordered an evidentiary hearing for the school districts to present detailed evidence concerning the history of government-to-government compacts between the Navajo Nation and the State of Arizona and the ethnic composition of the districts. Only then did the school districts file this action in federal court seeking to enjoin the tribal-court proceedings and arguing that exhaustion was not required because the tribal court plainly lacked jurisdiction. The school districts named as defendants the seven claimants identified above, and members of the tribal court assigned to the consolidated case.
In federal court, the defendants filed a motion to dismiss, and the school districts *909 filed a motion for summary judgment. The district court granted Window Rock and Pinon’s motion for summary judgment. In doing so, the court began with the touchstone authority concerning tribal-court jurisdiction over non-tribal members, Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). The court recognized that Montana’s general rule governed these claims due to “the state’s considerable interest, arising from outside of the reservation, in providing for a general and uniform public education.” The court considered Montana’s two exceptions, but decided that neither of them established tribal jurisdiction over these employment-related disputes between the school1 districts and their present and former employees, and that further factual development was not necessary because tribal jurisdiction was plainly lacking. The panel majority reverses, deciding that tribal-court jurisdiction is plausible and exhaustion is thus required.[4] I would affirm the district court’s ruling in all respects.
DISCUSSION
I. Although Indian Tribes Retain Inherent Sovereign Powers, They Do Not Possess the Full Attributes of Sovereignty.
“Indian tribes are ‘unique aggregations possessing attributes of sovereignty over both their members and their territory.’ ” Montana, 450 U.S. at 563, 101 S.Ct. 1245 (quoting United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), superseded by statute on other grounds as recognized in United States v. Lara, 541 U.S. 193, 199-207, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004)). They possess inherent “powers of self-government.” 25 U.S.C. § 1301. “Thus, in addition to the power to punish tribal offenders, the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.” Montana, 450 U.S. at 564, 101 S.Ct. 1245. Tribes “may also exclude outsiders from entering tribal land,” Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 328, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008), and “place conditions on entry, on continued presence, or on reservation conduct, such as a tax on business activities conducted on the reservation,” Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 144, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). Tribes retain these inherent sovereign powers in the absence of contrary treaties or federal statutes. See Nevada v. Hicks, 533 U.S. 353, 365, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001).
But “Indian tribes are ... no longer ‘possessed of the full attributes of sovereignty.’ ” Wheeler, 435 U.S. at 323, 98 S.Ct. 1079 (quoting United States v. Kagama, 118 U.S. 375, 381, 6 S.Ct. 1109, 30 L.Ed. 228 (1886)). “Their incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised.” Id. “[Ejxercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations ... cannot survive without express *910 congressional delegation.” Montana, 450 U.S. at 564, 101 S.Ct. 1245.
II. Tribal Jurisdiction Generally Does Not Extend to Non-Tribal Members.
The panel majority concludes that absent contrary treaties or federal statutes, Indian tribes’ inherent sovereign right to exclude generally affords tribal-court jurisdiction over nonmember conduct on tribal land. Not so. Supreme Court precedent and our own case law makes clear that at least where there are competing state interests, tribes generally lack jurisdiction over the conduct of non-tribal members within the boundaries of a reservation, regardless of the status of the land on which nonmember conduct occurs.
In Montana v. United States, the Supreme Court addressed whether the Crow Tribal Council had jurisdiction to regulate non-Indian hunting and fishing on non-Indian land located within the Crow Reservation.[5] 450 U.S. at 547, 101 S.Ct. 1245. Finding no treaties or statutes that conferred tribal authority to regulate such conduct on non-Indian land within the reservation, the Supreme Court discussed whether such regulatory authority existed by virtue of the Crow Tribe’s inherent sovereign authority. Id. at 557-66, 101 S.Ct. 1245. The Supreme Court stated that as a “general proposition[,] ... the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.” Id. at 565, 101 S.Ct. 1245. “[T]he Indian tribes have lost any ‘right of governing every person within their limits except themselves.’ ” Id. (quoting Fletcher v. Peck, 10 U.S. (6 Crunch) 87, 147, 3 L.Ed. 162 (1810)).
The Montana Court nonetheless articulated two exceptions to the general rule of no tribal jurisdiction over nonmembers: (1) “[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements”; and (2) “[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribes.” Id. at 565-66, 101 S.Ct. 1245. The Supreme Court then held that regulating non-Indian hunting and fishing on non-Indian land did not fall into either exception and, as such, was not within the Crow Tribe’s jurisdiction. Id. at 566, 101 S.Ct. 1245.
Montana was directed at tribal regulatory áuthority, but in Strate v. A-1 Contractors, the Supreme Court extended Montana’s rule to tribal adjudicative authority. 520 U.S. 438, 442, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). Strate arose when two non-Indians were involved in a car accident on a highway that crossed the Fort Berthold Indian Reservation in North Dakota. Id. at 442-43, 117 S.Ct. 1404. The state operated the highway pursuant to a federally granted right of way, but the tribal court determined it had jurisdiction to hear a suit for damages between the *911 drivers, one driver’s employer, and the employer’s insurer. Id. at 443-44, 117 S.Ct. 1404. The tribal-court defendants sued in federal court to enjoin the tribal-court proceedings, id. at 444, 117 S.Ct. 1404, eventually leading to the Supreme Court’s 'first statement that while Montana applies to questions of tribal adjudicative jurisdiction, “[a]s to nonmembers, ... a tribe’s adjudicative jurisdiction does not exceed its legislative jurisdiction,” id. at 453, 117 S.Ct. 1404. Applying this holding to the accident in Strate, the Court held that neither Montana exception afforded tribal-court jurisdiction over “run-of-the-mill” car-accident suits occurring on state-operated highways. Id. at 456-59, 117 S.Ct. 1404.
In these decisions, the Supreme Court broadly stated the general rule of no tribal jurisdiction over nonmembers, but the Court only had occasion to apply the rule to conduct on land owned or controlled by non-Indians. That changed in Nevada v. Hicks, where the Supreme Court addressed tribal-court jurisdiction over a claim for damages arising from a state game warden’s service of process on tribal land. 533 U.S. 353, 356-57, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). In Hicks, Nevada state game wardens allegedly damaged property of tribal member Floyd Hicks and exceeded the bounds of a search warrant while searching Hicks’ home for evidence that he unlawfully killed a bighorn sheep off the reservation. Id. The Supreme Court held that the tribal court did not have jurisdiction over Hicks’ civil claims against the state game wardens. Id. at 364-69, 121 S.Ct. 2304.
The Hicks Court further held that the State of Nevada was not required to exhaust tribal remedies before bringing its jurisdictional challenge in federal court because the tribal court plainly lacked jurisdiction. Id. at 369, 121 S.Ct. 2304. The decision expressly extended Montana’s general rule of no tribal jurisdiction to non-Indian conduct on Indian land. Id. at 360, 98 S.Ct. 1011 (stating that “the general rule of Montana applies to both Indian and non-Indian land” and “[t]he ownership status of the land ... is only one factor to consider”). The Court was clear that its ruling did not contravene “the principle that Indians have the right to make then-own laws and be governed by them,” but equally clear that this right must be balanced against the State’s “interests outside the reservation.” Id. at 362, 121 S.Ct. 2304.
The Supreme Court reaffirmed the Hicks holdings in Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008). Plains Commerce Bank involved allegations that a non-Indian bank sold fee land that it owned on a reservation to non-Indians under terms that were more favorable than terms the bank offered to an Indian couple. See id. at 320-24, 128 S.Ct. 2709. The couple sued the bank for discrimination in tribal court, and they were awarded a $750,000 general verdict. Id. at 323, 128 S.Ct. 2709. The bank sought a declaratory judgment in federal district court that the tribal judgment was null and void due to lack of jurisdiction over the couple’s discrimination claim. Id. Applying Montana, the Supreme Court agreed with the bank. Id. at 324, 128 S.Ct. 2709.
The Court .began its analysis with the principle that “tribes do not, as a general matter, possess authority over non-Indians who come within their borders.” Id. at 328, 128 S.Ct. 2709. The Supreme Court reiterated that although this principle applies with particular strength to “non-Indian fee land,” the ownership of the land is just one factor, and tribal authority over nonmember conduct on all land within a reservation is restricted. See id. at 327-28, 128 S.Ct. 2709. Plains Commerce Bank recognized the continuing validity of the two *912 Montana exceptions, but held that neither exception conferred jurisdiction on the tribal court under the facts of that case. Id. at 329-30, 340-41, 128 S.Ct. 2709.[6]
Our court has recognized that, apart from the two Montana exceptions, “the tribes’ inherent sovereignty does not give them jurisdiction to regulate the activities of nonmembers.” See Philip Morris USA, Inc. v. King Mountain Tobacco Co., 569 F.3d 932, 938-39 (9th Cir. 2009) (“As a general rule, tribes do not have jurisdiction, either legislative or adjudicative, over nonmembers, and tribal courts are not courts of general jurisdiction”). But in two recent cases, our circuit case law purports to limit Montana’s expansive general rule: Water Wheel Camp Recreational Area, Inc. v. LaRance, 642 F.3d 802 (9th Cir. 2011) (per curiam), and Grand Canyon Skywalk Development, LLC v. ‘Sa’ Nyu Wa Inc., 715 F.3d 1196 (9th Cir. 2013).
In Water Wheel, our court considered a dispute arising from the lease of a resort located on land held in trust by the United States for the Colorado River Indian Tribes. 642 F.3d at 805. After leasing the land for twenty-five years, the resort stopped making the required lease payments to the Tribes but continued to operate essentially rent-free for another seven years. Id. The resort operators refused to vacate the land even after the lease expired, so the Tribes sued to evict the resort operator, collect unpaid rent, and recover damages for their lost use of the property. Id.
It was in this context that our court stated, “[Hicks’s] application of Montana to a jurisdictional question arising on tribal land should apply only when the specific concerns at issue in that case exist. Because none of those circumstances exist here, we must follow precedent that limits Montana to cases arising on non-Indian land.” Id. at 813. Water Wheel went on:
In this instance, where the non-Indian activity in question occurred on tribal land, the activity interfered directly with the [Tjribe’s inherent powers to exclude and manage its own lands, and there are no competing state interests at play, the [Tjribe’s status as landowner is enough to support regulatory jurisdiction without considering Montana.
Id. at 814 (emphasis added). Water Wheel did not precisely identify what it meant by the “specific concerns” at issue in Hicks that warranted application of Montana’s general rule to jurisdictional questions arising on tribal land, but it did expressly recognize that “competing state interests” would change the analysis. There were no competing state interests in Water Wheel, and the court concluded that the Tribes had both regulatory and adjudicative jurisdiction over the resort operator’s conduct. See id. at 816.
*913 Notably, Water Wheel also concluded that Montana’s two exceptions would allow for jurisdiction over the Tribes’ dispute with the resort operator. Id. at 816-19. In particular, the second Montana exception established tribal jurisdiction over the Tribes’ trespass claim because the resort operator’s “unlawful occupancy and use of tribal land not only deprived [the Tribes’] of [their] power to govern and regulate [their] own land, but also of [their] right to manage and control an asset capable of producing significant income.” Id. at 819. In keeping with Hicks’ admonition that land ownership status “may sometimes be a dispositive factor,” see Hicks, 533 U.S. at 360, 121 S.Ct. 2304, Water Wheel concluded that the Tribes’ assertion of jurisdiction was proper in light of their significant interest in securing occupancy and control of tribal land and the absence of competing state interests, 642 F.3d at 819.
In Grand Canyon, our court considered a situation similar to Water Wheel. Grand Canyon involved the glass-bottomed “Sky-walk,” a viewing platform overlooking the Grand Canyon built on land held in trust for the Hualapai Tribe. 715 F.3d at 1198-99. A non-tribal developer, Grand Canyon Skywalk Development, entered into a revenue sharing agreement with a tribal corporation in order to build and operate the Skywalk, and the Tribe later passed a resolution to exercise eminent domain over the developer’s contractual interests. Id. at 1199.
Alleging that the Tribe had no authority to condemn its private contract rights, the developer filed a motion for a temporary restraining order in district court seeking to enjoin the eminent domain action. Id. Grand Canyon held that the developer was required to exhaust its remedies in tribal court. See id. at 1203-04. In so ruling, the court looked to Water Wheel and notedthat, as in Water Wheel, Grand Canyon involved a non-tribal-member who entered into a consensual agreement “to develop and manage a tourist location on tribal land in exchange1'for a fee” and “it was access to the valuable tribal land that was the.essential basis for the agreement.” Id. at 1204. Grand Canyon reasoned, “as the dispute centers on Hualapai trust land and there are no obvious state interests at play, the Hicks exception is unlikely to require Montana’s application. At the very least, it cannot be said that the tribal court plainly lacks jurisdiction.” Id. at 1205 (emphasis added). Like Water Wheel, Grand Canyon concluded that the Montana exceptions, if applied, would also provide for tribal jurisdiction. Id. at 1205-06.
The results in Water Wheel and Grand Canyon were a function of the Tribes’ significant interests in managing exceptionally valuable tribal land and the lack of any competing state interests. See, e.g., Water Wheel, 642 F.3d at 814 (emphasizing that “the activity interfered directly with the [Tjribe’s inherent powers to exclude and manage its own lands, and there are no competing state interests at play”). Nevertheless, our court’s narrow interpretation of Hicks and Montana has been criticized. The dissent in Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians observed, “Both the Choctaw Supreme Court and the district court a quo have ruled, in light of dicta in Hicks and Plains Commerce Bank, that the Ninth Circuit’s narrow application of Montana is incorrect, a ruling that the tribal defendants do not challenge.” 746 F.3d 167, 180 n.8 (5th Cir. 2014) (Smith, J., dissenting), aff'd by an equally divided court sub nom. Dollar Gen. Corp. v. Miss. Band of Choctaw Indians, — U.S. -, 136 S.Ct. 2159, 195 L.Ed.2d 637 (2016).[7] And in Stifel, Nico *914 laus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians, the Seventh Circuit expressed its view that Water Wheel’s, reasoning cannot be reeon-ciled “with the language that the Court employed in Hicks and Plains Commerce Bank.” 807 F.3d 184, 207 n.60 (7th Cir. 2015). But even assuming Water Wheel and Grand Canyon correctly interpreted Hicks to mean that Montana need not be applied in every case involving tribal land, all existing authority points to the rule that when there are no contrary treaties or statutes and there are competing state interests at stake, tribal jurisdiction over nonmembers only exists if at least one .of the two Montana. exceptions is satisfied.[8]
III. The Tribe Does Not Have the Right to Exclude Nonmember School Districts from the Reservation.
The panel majority further errs by concluding that the Treaty of 1868 secured the Navajo Nation’s unqualified right to exclude the school districts, and by disregarding the compelling state interests at play here. The Treaty of 1868 carved out and reserved specific rights for the Navajo Nation. By virtue of its inherent tribal sovereignty, the Navajo Nation also retained other rights necessary to self-government and control of internal relations, see Strate v. A-1 Contractors, 520 U.S. 438, 445-46, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) (discussing what powers the tribes retain), but the right to exclude nonmember school districts from the Navajo Reservation is not among them.[9]
A. The Tribe Ceded Any Inherent Right to Exclude the School Districts from the Reservation.
“[A] portion of what had once been [the Navajo Nation’s] native country” was set apart as the Navajo people’s “permanent home” by the Treaty of 1868. Williams v. Lee, 358 U.S. 217, 221, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). Article II of the Treaty “provided that no one, except United States Government personnel, was to enter the reserved area.” Id. According to Article II:
[T]he United States agrees that no persons except those herein so authorized to do, and except such officers, soldiers, agents, and employees of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article.
Treaty between the United States of America and the Navajo Tribe of Indians, *915 Navajo Tribe of Indians-U.S. (Treaty of 1868), art. II, June 1, 1868,15' Stat. 667. Though the majority suggests otherwise, this provision does not grant the Navajo Nation an absolute right to exclude. In fact, the Treaty of 1868 expressly allows for entry of federal government agents for various purposes and specifically obligates the government to provide compulsory education of Navajo children in schoolhouses created by the government, by schoolteachers furnished by the government and “residing] among” the Tribe. See Treaty of 1868, art. VI.
When the Treaty of 1868 was executed, the State of Arizona did not exist, but Arizona took on the obligation to provide compulsory education to Navajo children as a condition of Arizona’s statehood. In the Arizona Enabling Act, Congress mandated that Arizona shall establish and maintain “a system of public schools[,] which shall be open to all the children of [Arizona],” Act of June 20, 1910, ch. 310, 36 Stat. 557, 570 (1910), and that this public school system “shall forever remain under [Arizona’s] exclusive control,” id. at 573-74. In its constitution, Arizona both agreed to disclaim all rights to Indian land within its boundaries, Ariz. Const, art. XX, § 4, and affirmed its obligation to provide a system of public schools “open to all the children of the state,” id. § 7.
In 1929, Congress authorized “the agents and employees of any State to enter upon Indian tribal lands, reservations, or allotments therein ... to enforce the penalties of State compulsory school attendance laws against Indian children[] and parents.” Act of Feb. 15, 1929, ch. 216, 45 Stat. 1185. Congress amended the act in 1946 to require tribal consent to such entry, see Act of Aug. 9, 1946, ch. 930, 60 Stat. 962, and the Navajo Nation consented, see 10 Navajo Nation Code § 503. Nothing in subsequent legislation, see Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5301 (1975), relieved Arizona of its obligation to provide a uniform, statewide system of public education.
The panel majority does not acknowledge that the State of Arizona became subject to the Treaty’s specific requirement of providing government schools on Indian land. Nor does it consider that the school districts are political subdivisions of the State of Arizona, present within the Navajo Nation for the purpose of carrying out the expressly contemplated function of educating Navajo children. The panel majority reasons that the Navajo Nation generally retained its right to exclude after signing the Treaty of 1868, but it offers no support for its conclusion that the Tribe may exclude school districts where, as here, the state officials are performing a governmental function on tribal land pursuant to a congressional mandate with tribal consent.
The holding in Strate v. A-1 Contractors, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), is instructive in this context. In that ease, a car crash involving non-Indians occurred on a highway over land that the United States held in trust for the Three Affiliated Tribes. Id. at 442-43, 117 S.Ct. 1404. The State of North Dakota operated and maintained the highway pursuant to a federally granted right-of-way. Id. With the Tribes’ consent, Congress gave the right-of-way to North Dakota to ensure access to a federal water-resource project controlled by the Army Corps of Engineers. Id. at 454-56, 117 S.Ct. 1404. Given these circumstances, the Supreme Court held that the highway was the “equivalent, for nonmember governance purposes, to alienated, non-Indian land,” over which “the Tribes [could not] assert a landowner’s right to occupy and exclude.” Id. at 454, 456, 117 S.Ct. 1404; *916 see also Cty. of Lewis v. Allen, 163 F.3d 509, 514 (9th Cir. 1998) (en banc) (holding that the Nez Perce Tribe ceded the right to exclude county law enforcement officers by “consenting to and receiving the benefits of state law enforcement protection”). So too here. Like the tribe in Strate, the Navajo Nation has ceded the right to exclude the school districts from the Navajo oftlineReservation by: (1) expressly agreeing that the federal government must enter to provide a system of compulsory education for Navajo children; and (2) consenting to state enforcement of compulsory education on the Navajo Reservation.
B. The Significant State Interests Present Here Render Water Wheel and Grand Canyon Inapplicable.
The panel majority asserts that our court interprets Hicks, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398, “as creating only a narrow exception to the general rule that, absent contrary provisions in treaties or federal statutes, tribes retain adjudicative authority over nonmember conduct on tribal land — land over which the tribe has the right to exclude.” (Emphasis added). This flips Montana’s general rule on its head. The majority primarily looks to Water Wheel and Grand Canyon to support this interpretation of Supreme Court precedent, but even those outlier decisions do not permit such a cramped reading of Hicks, and no existing authority supports the newly minted rule that the panel majority dubs “general.”[10]
First, as noted, Water Wheel and Grand Canyon recognized that Montana’s exceptions allowed for tribal jurisdiction in what respectively amounted to a landlord-tenant dispute and an eminent domain action involving prime tribal land. As such, the disputes arose from “activit[ies] [that] interfered directly with the [T]ribe’s inherent powers to exclude and manage its own lands.” Water Wheel, 642 F.3d at 814. Second, both cases acknowledged that Hicks requires application of the Montana framework when there are “competing state interests at play.” See Water Wheel, 642 F.3d at 810-14; Grand Canyon, 715 F.3d at 1204-05. Those interests were entirely absent in Water Wheel and Grand Canyon. To the contrary, the non-tribal-members in Water Wheel and Grand Canyon were private businesses engaged in consensual, for-profit transactions with the *917 Tribes and the Tribes had overwhelming interests in the use and disposition of their tribal assets (“prime” tribal land on the banks of the Colorado River in one case, and tribal land overlooking the Grand Canyon in the other). See Water Wheel, 642 F.3d at 817; Grand Canyon, 715 F.3d at 1198. In this way, Water Wheel and Grand Canyon were consistent with Hicks’ observation that the ownership of land is only one factor to consider in analyzing whether tribal-court jurisdiction exists, but in some circumstances land ownership may be dis-positive.
The case at bar stands in stark contrast. For starters, the employees’ disputes with Window Rock and Pinon School Districts have nothing to do with occupancy of the tribal land or buildings in which the school districts operate. These disputes involve entitlement to teacher merit pay provided by a state ballot measure and the rights and obligations arising from the claimants’ employment contracts. The Navajo Nation Supreme Court’s amicus brief asserts interests in protecting Navajo employees and students, and the tribal court’s opening brief asserts interests in hearing complaints arising from employment decisions of all-Navajo school boards. But the school boards are political subdivisions of the State of Arizona, and Arizona has vitally important competing interests in the finality of its state-court judgments and its ability to enforce them. Further, Arizona’s constitution mandates “the establishment and maintenance of a general and uniform public school system,” Ariz. Const, art. 11, § 1, a requirement of the Arizona Enabling Act, ch. 310, 36 Stat. 557, 570 (1910). It cannot be questioned that Arizona has a compelling interest in complying with its statutory and state constitutional mandate. With these state interests at issue, Hicks requires us to apply Montana notwithstanding the holdings in Water Wheel and Grand Canyon}[11]
Our circuit is already an outlier in this area of the law. Only our circuit interprets Hicks to mean that the Montana framework need not be applied to questions of tribal jurisdiction over nonmembers in the absence of competing state interests. Today, the panel majority goes one giant step farther, interpreting Hicks to authorize dodging Montana even when there are exceptionally strong competing state interests, so long as those interests do not involve state criminal law enforcement and the dispute arises on tribal land. No case law, from any circuit, suggests this is the correct analysis.
The panel majority puts our court at odds with every other circuit that has addressed tribal jurisdiction over nonmembers after Hicks. Recently, the Seventh Circuit unanimously rejected the argument that notwithstanding Hicks and Plains Commerce Bank, “Montana only applies to situations in which tribes attempt to regulate nonmember conduct on non-Indian fee land, as opposed to tribal trust land.” Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians, 807 F.3d 184, 206 (7th Cir. 2015). In two cases specifically involving school districts, the Eighth Circuit did not find ownership of the land dispositive, ana *918 lyzed the contours of tribal jurisdiction over nonmembers within the Montana framework, and held that the tribal court lacked jurisdiction over tribal members’ claims against the districts. See Belcourt Pub. Sch. Dist. v. Davis, 786 F.3d 653, 660 n.5, 661 (8th Cir. 2015); Fort Yates Pub. Sch. Dist. No. 4 v. Murphy ex rel. C.M.B., 786 F.3d 662, 670 & n.6 (8th Cir. 2015).
The Tenth Circuit is in accord with the Seventh and Eighth Circuits. It considered a case in which the Navajo Nation asserted jurisdiction over county employees and concluded: “The notion that Montana's, applicability turns, in part, on whether the regulated activity took place on non-Indian land was finally put to rest in Hicks.” MacArthur v. San Juan Cty., 497 F.3d 1057, 1069 (10th Cir. 2007). Striking out on its own, the panel majority today announces a decision that pits our circuit’s case law against Tenth Circuit precedent, subjecting the Navajo Nation’s tribal courts to different rules governing their assertion of jurisdiction. See id. at 1069-70.
Nor does the panel majority’s reading of Hicks find support in the Supreme Court case itself. Hicks began its analysis with “the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.” 533 U.S. at 358-59, 121 S.Ct. 2304 (quoting Montana, 450 U.S. at 565, 101 S.Ct. 1245). The panel majority characterizes Hicks as “suggesting] ... ‘the general rule of Montana applies to both Indian and non-Indian land'.’ ” (Quoting Hicks, 533 U.S. at 360, 121 S.Ct. 2304). But the Supreme Court left nothing to suggestion. Hicks’ holding on this point is express:
While it is certainly true that the non-Indian ownership status of the land was central to the analysis in both Montana and Strate, the reason that was so was not that Indian ownership suspends the “general proposition” ... that “the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe” except to the extent “necessary to protect tribal self-government or to control internal relations.”
533 U.S. at 359, 121 S.Ct. 2304 (quoting Montana, 450 U.S. at 564-65, 101 S.Ct. 1245).
In fact, two concurring Justices in Hicks emphasized their agreement with the Supreme Court majority that Montana governs the question of tribal civil jurisdiction over nonmembers’ conduct no matter who holds title to the land on which the conduct occurs. See id. at 375, 121 S.Ct. 2304 (Souter, J., concurring) (“Like the Court, I take Montana v. United States ... to be the source of the first principle on tribal-court civil jurisdiction....”); id. at 387, 121 S.Ct. 2304 (O’Connor, J., concurring) (“Today, the Court finally resolves that Montana v. United States ... governs a tribe’s civil jurisdiction over nonmembers regardless of land ownership. ... This is done with little fanfare, but the holding is significant because we have equivocated on this question in the past.”).
Essentially, the panel majority decides that the Supreme Court did not mean what it said. It relies entirely on a strained reading of the second footnote in Hicks where the Court explained, “Our holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law. We leave open the question of tribal-court jurisdiction over nonmember defendants in general.” Id. at 358 n.2, 121 S.Ct. 2304.
In this footnote, the Supreme Court focused on the status of the nonmember, not the land, foreseeing a case such as Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians, 746 F.3d 167, 180 (5th Cir. 2014), where the Fifth Circuit was called upon to *919 address tribal jurisdiction over a nonmember private actor rather than a government agent.[12] Footnote two lends no support to the panel majority’s thesis; it only establishes that Hicks stopped short of announcing a bright line rule concerning tribal jurisdiction over all nonmembers. The footnote does not excuse our court from applying Montana.
At best, under our existing circuit precedent and Supreme Court authority, what the panel majority calls “the right-to-exclude framework” applies to nonmember conduct on tribal land only if there are no contrary treaties or statutes and no competing state interest at play. Here, Arizona possesses obvious competing and compelling interests. The panel majority insists that it need not decide whether Hicks covers state interests other than those in criminal law enforcement. But in light of the state interests in this case, Hicks already requires us to begin with Montana's, general rule that tribes lack civil jurisdiction over nonmembers unless one of the Montana exceptions is satisfied.
IV. The Tribe Plainly Lacks Jurisdiction Under Montana.
Where no treaty or statute confers tribal jurisdiction and competing state interests are at play, federal courts assessing civil tribal jurisdiction over nonmembers look to the two exceptions described in Montana, 450 U.S. at 563-66, 101 S.Ct. 1245. Neither exception plausibly justifies the assertion of tribal-court jurisdiction over the employees’ claims against the school districts.
The first Montana exception provides that “[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.” Id. at 565, 101 S.Ct. 1245. Hicks explained that in the context of Montana’s first exception, “ ‘other arrangement’ is clearly another private consensual relationship,” and rejected the argument that, by seeking a search warrant from the tribal court, the state game wardens entered into a relationship with the Tribe that gave rise to tribal jurisdiction. Hicks, 533 U.S. at 359 n.3, 121 S.Ct. 2304. Courts of appeal, including this court sitting en banc, have uniformly interpreted Montana’s first exception as inapplicable to relationships between tribes or tribal members and governmental entities. See Belcourt Pub. Sch. Dist. v. Davis, 786 F.3d 653, 659 (8th Cir. 2015) (operating agreement between Tribe and school district); Fort Yates Pub. Sch. Dist. No. 4 v. Murphy ex rel. C.M.B., 786 F.3d 662, 668 (8th Cir. 2015) (same); MacArthur v. San Juan Cty., 497 F.3d 1057, 1072-74 (10th Cir. 2007) (employment contracts between tribal members and county medical clinic); Cty. of Lewis v. Allen, 163 F.3d 509, 515 (9th Cir. 1998) (en banc) (law enforcement agreement between the Tribe and county). Montana’s first exception only applies to private consensual relationships, not to relationships involving state subdivisions, such as the Window Rock and Pinon Unified School Districts.
*920 Even if Montana’s, first exception encompassed tribal relationships with governmental entities, it does not yield a plausible argument that assertion of tribal-court jurisdiction over the school districts’ employment contracts would be proper. At bottom, the first exception is a recognition that parties who enter into consensual relationships with tribes or tribal members can fairly anticipate being subject to tribal-court jurisdiction. See Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 338, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008). The school districts’ contractual relationships with its seven employees provided that the employees would abide by state and federal law — and two of the employment contracts actually specified that jurisdiction for disputes arising from the contracts would lie in state and federal courts and that the contracts would be governed by state and federal law. Based on these contractual provisions, the school districts could not have anticipated that they would be hailed into Navajo tribal court.
The employees’ lawsuits against the school districts and the school districts’ counter suit for a declaratory judgment arise from employment contracts. Notably, the Navajo Nation is not a party to the employment contracts. The panel majority does not identify a nexus between the school districts’ contact with the Navajo Nation and “the activity giving rise to this lawsuit.” See Philip Morris USA, Inc. v. King Mountain Tobacco Co., 569 F.3d 932, 942 (9th Cir. 2009). The Navajo Nation is a “stranger[ ]” to these employment relationships. See Strate v. A-1 Contractors, 520 U.S. 438, 457, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) (citation omitted). Some of the employees are not even members of the Navajo Nation.
The school districts’ leases with the Navajo Nation do not provide the missing jurisdictional hook. The Supreme Court has observed that consensual relationships with tribes are not “in for a penny, in for a Pound.” See Plains Commerce Bank, 554 U.S. at 338, 128 S.Ct. 2709 (quoting Atkinson Trading Co. v. Shirley, 532 U.S. 645, 656, 121 S.Ct. 1825, 149 L.Ed.2d 889 (2001)). Non-Indians, such as the school districts, do not consent to tribal-court jurisdiction over unrelated transactions by entering into separate consensual relationships, such as leases, with a tribe. See id. “[T]he suit must also arise out of those consensual contacts,” Philip Morris, 569 F.3d at 941 (emphasis added), and there must be “a nexus to the consensual relationship between the nonmember and the disputed commercial contacts with the tribe,” id. at 942.
The interest asserted by the Navajo Nation is not the sort that satisfies the second Montana exception. The second Montana exception provides that a tribe “retain[s] inherent power to exercise civil authority over the conduct of non-Indians ... when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.” Montana, 450 U.S. at 566, 101 S.Ct. 1245. Conduct giving rise to jurisdiction under this exception must “imperil the subsistence” of the Tribe such that tribal power is necessary to “avert catastrophic consequences.” Plains Commerce Bank, 554 U.S. at 341, 128 S.Ct. 2709 (citations omitted). For example, federal courts have concluded that the second Montana exception was at least plausibly satisfied where a non-Indian security company forcibly entered a tribal government building and seized tribal government documents; where a non-Indian trespassed on Indian land and started a forest fire; and where non-Indian landowners exercised riparian rights in a way that threatened environmental degradation of important tribal resources. See Attorney’s Process & Investigation *921 Servs., Inc. v. Sac & Fox Tribe of the Miss. in Iowa, 609 F.3d 927, 932, 941 (8th Cir. 2010) (document seizure); Elliott v. White Mountain Apache Tribal Court, 566 F.3d 842, 844-45, 848-51 (9th Cir. 2009) (forest fire); Confederated Salish & Kootenai Tribes of the Flathead Reservation, Mont. v. Namen, 665 F.2d 951, 964 (9th Cir. 1982) (riparian rights).
Courts generally do not find that private transactions, like the employment relationships here, implicate Montana’s second exception. In Plains Commerce Bank, tribal members alleged that a nonmember bank had discriminated against them in a land sale, 554 U.S. at 322, 338, 128 S.Ct. 2709, but the Supreme Court held that the Tribe lacked jurisdiction over the dispute, reasoning, “The sale of formerly Indian-owned fee land to a third party ... cannot fairly be called ‘catastrophic’ for tribal self-government.” Id. at 341, 128 S.Ct. 2709 (quoting Strate, 520 U.S. at 454, 117 S.Ct. 1404). The second Montana exception is narrow. See Strate, 520 U.S. at 459, 117 S.Ct. 1404; State of Mont. Dep’t of Transp. v. King, 191 F.3d 1108, 1114 (9th Cir. 1999).
Defendants argue that the employees’ lawsuits against the school districts concern the Navajo Nation’s interest in enforcing the Navajo Preference in Employment Act and thus lowering unemployment. Certainly, the welfare of a tribe is harmed by very high levels of unemployment on reservations. See King, 191 F.3d at 1114. But in a similar situation, we held that even the Tribe’s interest in promoting local hire does not justify the assertion of tribal-court jurisdiction. King considered whether a tribe could regulate employment practices for hiring construction workers on a state highway running through a reservation and concluded the tribe lacked this regulatory authority. See id. at 1110-12. Notwithstanding the Tribe’s interest in lowering unemployment, we held:
The [Tribe] agreed to the right of way, and the State of Montana became responsible to maintain the road at its own expense. Thus, the [Tribe’s] assertion of authority over the State’s own employees goes beyond the internal functioning of the [T]ribe and its sovereignty and instead impinges on one of the State of Montana’s sovereign responsibilities— maintaining Highway 66 and the right of way at its own expense.
Id. at 1114 (internal quotation marks omitted).
The panel majority does not explain why a different outcome is warranted for a dispute seeking merit pay under a state initiative, or a suit challenging a school district’s grounds for terminating a teacher for failure to abide by school-district policies, or a case invoking the Navajo Preference in Employment Act. The concerns that mandated the outcome in King require the same result here: under the Arizona Enabling Act and the Arizona Constitution, the State bears the sovereign responsibility to maintain Arizona’s school system and the Navajo Nation cannot plausibly claim jurisdiction over the contractual relationships between the school districts and their employees. The facts of this case fall well beyond the boundaries of the second Montana exception.
V. Exhaustion in Tribal Court Was Not Required.
Exhaustion in tribal court is not required if “it is plain” that tribal court jurisdiction is lacking and the exhaustion requirement “would serve no purpose other than delay.” Hicks, 533 U.S. at 369, 121 S.Ct. 2304 (quoting Strate, 520 U.S. at 459 n.14, 117 S.Ct. 1404). Under our precedent, “it is ‘plain’ that the tribal court lacks jurisdiction” if jurisdiction is neither “col- *922 orable” nor “plausible.” Elliott v. White Mountain Apache Tribal Court, 566 F.3d 842, 848 (9th Cir. 2009) (quoting Atwood v. Fort Peck Tribal Court Assiniboine, 513 F.3d 943, 948 (9th Cir. 2008)). Here, I would hold that jurisdiction is plainly lacking and that exhaustion in tribal court is not required.
The majority invokes the Supreme Court’s general policy in favor of exhaustion, citing National Farmers Union Insurance Cos. v. Crow Tribe of Indians. See 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985); National Farmers identified the factors underpinning this policy: (1) “supporting tribal self-government and self-determination”; (2) allowing “the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge”; (3) “allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed”; and (4) “providfing] other courts with the benefit of [tribal courts’] expertise in such matters in the event of further judicial review.” Id. at 856-57, 105 S.Ct. 2447. More recently, the Supreme Court emphasized that exhaustion was required in National Farmers “based on comity,” Strate, 520 U.S. at 453, 117 S.Ct. 1404, and a preference for “allowing tribal courts initially to respond to an invocation of their jurisdiction,” id. at 448, 117 S.Ct. 1404. The Supreme Court “d[id] not extract from National Farmers anything more than a prudential exhaustion rule, in deference to the capacity of tribal courts ‘to explain to the parties the precise basis for accepting [or rejecting] jurisdiction.’” Id. at 450, 117 S.Ct. 1404 (alteration in original) (quoting Nat’l Farmers, 471 U.S. at 857, 105 S.Ct. 2447). Strate also made clear that exhaustion is not required when “it is plain that no federal grant provides for tribal governance of nonmembers’ conduct on land covered by Montana’s main rule.” Id. at 459 n.14, 117 S.Ct. 1404.
The comity concerns at play in National Farmers are not present here. The school districts did not seek to bypass the tribal court; they filed suit in federal court only after the tribal court declined to rule on their motion to dismiss and sought to impose a costly evidentiary hearing. Importantly, for five of the seven employees, state-court decisions had already been entered, and two of the employees’ contracts with the school districts expressly provided that jurisdiction shall be in state or federal court, not tribal court. Thus, it is clearly the state courts’ jurisdiction that is being challenged. Although these facts alone do not foreclose application of the preference for exhaustion in tribal court, they easily distinguish the case at bar from ones in which the Supreme Court has required exhaustion.[13]
Arizona has a compelling interest in ensuring that Navajo children have access to public education on the Navajo Reservation, and Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), is the applicable framework. Because I would hold that jurisdiction is not colorable or plausible under Montana, I respectfully dissent.

. The tribal court consolidated the separately filed complaints of Loretta Brutz, Mae John, and Ann and Kevin Reeves in 2009. The tribal court later consolidated these complaints with those of Michael Coonsis, Clarissa Hale, and Barbara Beall.

. The NPEA requires employers to give preference in employment to Navajos and dictates that employers may not fire Navajo employees without just cause. See 15 Navajo Nation Code §§ 601, et seq.

. By providing this background, I do not suggest that the merits of the claimants' disputes with the school districts are before us. The nature of the claims, not the merits of the claims, gives context to the jurisdictional question we must decide. It also shows that: (1) several of the claimants are actually challenging the jurisdiction of the state courts that already rendered verdicts on the same claims they raise here; and (2) unlike many cases involving challenges to tribal jurisdiction, comity concerns in this case weigh heavily against exhaustion.

. The majority describes several reasons behind the policy favoring exhaustion, see Nat’l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 856-57, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), but does not explain why the policy weighs in favor of exhaustion in this case. Strate v. A-1 Contractors, 520 U.S. 438, 450, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), makes clear that the exhaustion preference is based on prudential considerations and is not required if tribal jurisdiction is plainly lacking. See id. at 450-51, 117 S.Ct. 1404. This inquiry is highly case specific.

. The State of Montana owned this land in fee simple. See Montana, 450 U.S. at 547-48, 556, 101 S.Ct. 1245. Reservation land generally falls into three categories: (1) unallotted lands held in trust by the United States for the Tribe; (2) allotted land held in trust by the United States for individual Indians; and (3) fee lands now owned by non-Indians. See id. at 558, 101 S.Ct. 1245; see also Big Horn Cty. Elec. Co-op., Inc. v. Adams, 219 F.3d 944, 948 (9th Cir. 2000) ("There is a checkerboard pattern of land ownership on the Reservation composed of fee land owned by non-Indians and members of the Tribe and trust land held by the United States in trust for the Tribe.").

. The panel majority relies heavily on the fact that the school districts are located on tribal land, whereas the conduct in Plains Commerce Bank occurred on non-Indian fee land. Boiled down, the majority announces a rule that tribal jurisdiction is plausible any time nonmember conduct occurs on tribal land unless state criminal law enforcement interests are implicated. (“But it is at least plausible that the Tribe has adjudicative jurisdiction here because the conduct occurred on tribal land, where the Navajo Nation has the right to exclude.”). In doing so, the majority overlooks the general directives in Plains Commerce Bank. "[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.” 554 U.S. at 328, 128 S.Ct. 2709 (alteration in original) (quoting Montana, 450 U.S. at 565, 101 S.Ct. 1245). "This general rule restricts tribal authority over nonmember activities taking place on the reservation, and is particularly strong when the nonmember’s activity occurs on land owned in fee simple by non-Indians ....” Id. (emphasis added).

. The majority in Dolgencorp applied Montana and held that the Tribe had jurisdiction *914 over a nonmember based on the first Montana exception. See 746 F.3d at 169. The dissent agreed that Montana applied, but disagreed with the majority’s conclusion that the tribe had met the requirements of the first exception. See id. at 177-80 (Smith, J., dissenting).

. The panel majority states that neither Water Wheel nor Grand Canyon decided that Montana applies where there are competing state interests, only that Montana does not apply where there are no competing state interests. But both decisions skirt Montana and Hicks based on the lack of competing state interests and both acknowledge that Montana would otherwise be the rule. See Water Wheel, 642 F.3d at 804-05; see also Grand Canyon, 715 F.3d at 1205 ("Here, as the dispute centers on Hualapai trust land and there are no obvious state interests at play, the Hicks exception is unlikely to require Montanas application.” (emphasis added)).

. Defendants argue that the school districts may be tribal members for purposes of responding to employment claims in tribal court because tribal members sit on the school district boards. But this argument disregards Arizona law. See Ariz. Rev. Stat. § 15-101(23) (" ‘School district’ means a political subdivision of this state....”).

. The panel majority also cites one of our cases that followed close on the heals of Hicks: McDonald v. Means, 309 F.3d 530 (9th Cir. 2002). The majority describes McDonald as "explicitly rejecting] the argument that Hicks modified or overruled Montana such that it would 'bar tribal jurisdiction not only over the conduct of nonmembers on non-Indian fee land but on tribal land as well.’ ” (Quoting McDonald, 309 F.3d at 540 n.9). In McDonald, a minor member of the Cheyenne Tribe hit a horse owned by a nonmember. 309 F.3d at 535-36. The accident happened on a road that the McDonald court determined was Indian land. Id. at 537-40. McDonald treated ownership of the land as dispositive and concluded that the Tribe had jurisdiction over the dispute. Id. at 539-40. The holding was expressly limited to a tort claim involving an accident occurring on a tribal road: "We hold that the nature and purpose of the grant [of a right-of-way over the road to the Bureau of Indian Affairs], the continuing control exercised by the Tribe over the road, and the Supreme Court’s previous treatment of BIA roads supports the conclusion that the tribal court had jurisdiction to entertain [the minor Indian’s suit] against the McDonald family." Id. at 540: McDonald predates our en banc decision in Smith v. Salish Kootenai College, where we applied the Montana framework to a dispute arising on tribal land and stressed that in deciding whether a tribal court has jurisdiction over a nonmember "[o]ur inquiry is not limited to deciding precisely when and where the claim arose.” 434 F.3d 1127, 1135 (9th Cir. 2006) (en banc). McDonald and Smith are consistent with Hicks’ rule that ownership of the land is only one factor to consider.

. The panel majority opines that there are factual disputes that the tribal court should decide to determine what state interests exist in this case. In my view, the state interests at issue are already clear and no further factual development is necessary to determine whether these state interests are sufficient to preclude tribal jurisdiction. If a State’s interest in executing legal process to enforce its criminal laws was sufficient in Nevada v. Hides, 533 U.S. 353, 364, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), it is hard to imagine how a State’s interest in complying with a statutory and constitutional directive to provide a uniform system of public education to all the State’s children would be insufficient.

. In Dolgencorp, the nonmember over whom the tribal court asserted jurisdiction was the operator of a Dollar General store on the Choctaw Reservation. See 746 F.3d at 169. The store sat on Indian land and operated pursuant to a lease agreement and business license issued by the Mississippi Band of Choctaw Indians. Id. After the store entered into a consensual agreement to participate in a tribal job training program that placed young tribal members in internships with local businesses, the store manager allegedly molested one of the interns on store premises. Id. The intern brought tort claims against the store operator for negligent hiring, training, and supervision. Id.

. Moreover, National Farmers was decided thirty years ago and predates the Supreme Court’s holdings in Nevada v. Hicks, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), and Strate v. A-1 Contractors, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). See also State of Mont. Dep’t of Transp. v. King, 191 F.3d 1108, 1112-13, 1115 (9th Cir. 1999) (summarizing circumstances when exhaustion is not required). Even if tribal jurisdiction was plausible at the time National Farmers was decided, subsequent developments in the law render tribal jurisdiction implausible today.